AMARILLO NAT. BANK v. HARRELL et al.

(Court of Civil Appeals of Texas. Amarillo. June 28, 1913. Rehearing Denied Oct. 11, 1913.)

1. BANKS AND BANKING (§ 116*)—NOTICE TO OFFICERS — NOTICE RECEIVED IN PRIVATE CAPACITY.

The fact that one of the partners was president of the bank in which the firm accounts were kept does not impart to the bank knowledge of an agreement between the partners as to the manner in which the funds were to be deposited and checked out, where the agreement was not communicated to any other officer of the bank, since the knowledge was acquired by the president in his capacity as partner, and not as an officer of the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent.Dig. §§ 282–287; Dec.Dig. § 116.*]

2. PRINCIPAL AND AGENT (§ 160½*)—DUTIES OF AGENT—ADVERSE INTERESTS.

An agent cannot act so as to bind his principal in matters touching the agency when he has an adverse interest in such matters.

[Ed. Note.—For other cases, see Principal and Agent, Cent.Dig. § 588; Dec. Dig. § 160½.*]

3. PARTNERSHIP (§ 138*) — RIGHTS OF PARTNERS—DEPOSIT OF FUNDS.

A partner has the right, ordinarily, to direct how the account of a partnership shall be

kept in a bank, and it is the duty of the bank to obey such directions when it has no notice to the contrary.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 138.*]

4. BANKS AND BANKING (§ 117*)—PAYMENT OF CHECKS—PARTNERSHIP ACCOUNT.

Where the funds of a partnership were deposited with one of the partners in a bank of which he was president, in his own name, contrary to an agreement between the partners, but the other partner drew checks upon that account, and it was later transferred to his name, in accordance with the agreement, the bank was not liable to the partnership for the acts of its president in making the deposit as he did, where there is no evidence that the firm lost anything on that account.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 288; Dec. Dig. § 117.*]

5. BANKS AND BANKING (§ 117*)—REPRESENTATION BY OFFICERS — WRONGFUL ACTS IN PRIVATE CAPACITY.

Nor was the bank liable for funds which its president had received, but had never deposited in the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 288; Dec. Dig. § 117.*]

6. BANKS AND BANKING (§ 117*)—PAYMENT OF CHECKS—PARTNERSHIP CHECKS.

Where the account of a firm, in which the president of a bank was one partner, was carried in the name of the other partner, but the bank had knowledge that it was a partnership account, and there were no restrictions on the right of the other partner to draw out funds, the bank would not be liable to the firm or the other partner for moneys drawn out by the president from the partnership account, since each partner has a right to check upon the partnership account.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 288; Dec. Dig. § 117.*]

7. BANKS AND BANKING (§ 154*) — PAYMENT OF CHECKS—EXTENT OF LIABILITY—PARTNERSHIP FUNDS.

Where one partner is entitled to recover from a bank, which has been acting in collusion with another partner, for the wrongful conversion of partnership property, he can recover only his individual damages, not the entire value of the property, unless particular facts are shown which entitled him to all the damage.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502–512, 515, 516, 518–533; Dec. Dig. § 154.*]

8. PARTNERSHIP (§ 245*)—SET-OFF AND COUNTERCLAIM (§ 44*) — RIGHTS OF SURVIVING PARTNER—COLLECTION OF ASSETS.

A surviving partner is entitled to sue and recover the entire value of the property, and at common law he might set off a debt due the partnership against an individual debt owing by him.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 514–518; Dec. Dig. § 245;* Set-Off and Counterclaim, Cent. Dig. §§ 82–96, 98, 99; Dec. Dig. § 44.*]

9. PARTNERSHIP (§ 245*) — RIGHTS OF SURVIVING PARTNER—COLLECTION AND DISPOSITION OF ASSETS.

A surviving partner is entitled to all the assets of the firm as trustee to pay the debts of the partnership, and to account to the estate of the deceased partner for his share.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 514–518; Dec. Dig. § 245.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

10. BANKS AND BANKING (§ 154*)—RIGHTS OF SURVIVING PARTNER — COLLECTION OF ASSETS — CHECKS PAID TO DECEASED PERSON.

A surviving partner cannot, on behalf of the partnership, recover from a bank which has paid out partnership funds, contrary to an agreement between the partners, on the check of the other partner, who was president of the bank, the entire amount of such payments, but only the amount by which he has been damaged, since otherwise the bank would be required to demand an accounting between the partners in an action against the estate of its president, in order to determine whether the amounts he drew out were more than he was entitled to.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 502–512, 515, 516, 518–533; Dec. Dig. § 154.*]

Appeal from District Court, Potter County; J. N. Browning, Judge.

Action by the Amarillo National Bank against William Harrell and another. Judgment for the plaintiff for the amount claimed, less the amount of a set-off claimed by the defendants, and plaintiff appeals. Reversed, and judgment rendered for the plaintiff for the full amount claimed.

Sam R. Merrill, of Houston, and A. A. Lumpkin, of Amarillo, for appellant. R. E. Underwood and H. H. Cooper, both of Amarillo, for appellees.

HUFF, C. J. The Amarillo National Bank brought suit against appellee William Harrell on one note for $4,053.30, dated February 1, 1909, with 10 per cent. interest from date and the usual clause for 10 per cent. attorney's fees, upon which a credit was made March 29, 1909, for the sum of $2,000, and also sued on a note for $300, dated the 22d day of March, 1909, due July 22, 1909, with interest at the rate of 10 per cent. per annum from maturity and 10 per cent. attorney's fees. The appellee answered the petition by cross-petition, and thereafter he filed an original suit against the bank; and, upon a plea in abatement being presented, the court consolidated the two cases. After consolidation, appellee replead his case, first, by general denial, and specially, that on January 1, 1907, he and one R. L. Stringfellow engaged in buying and selling cattle under an agreement "that R. L. Stringfellow should furnish his credit and the means of obtaining the money for the conduct of said business, without the payment of any interest for moneys entering into said business, and necessary to carry on the same on the part of said William Harrell; that the said Harrell should contribute his skill, labor and judgment in the conduct of said business, and that after deducting the actual cost of the cattle purchased and the expenses of handling the same, the net profits were then to be divided equally; that it was understood that, in connection with said joint enterprise between said parties, said Harrell was to have exclusive management of said business in purchasing, handling, grazing, and selling said cattle, and that he should pay all moneys derived to the bank in his own name and receive the credit in said account carried in his own name, and the only contribution to said joint enterprise by said R. L. Stringfellow was obtaining the capital for carrying on said business without the payment of interest by the said Harrell." It is alleged that early in the year 1907 the business was begun by buying and contracting for cattle, and at that time Harrell had an account in his own name, where all moneys of the business were deposited, except as thereinafter noted. At the time of the agreement and up to the early part of 1909, Stringfellow was president and director in appellant bank.

There are quite a number of counts in the cross-petition setting up various items. We will set out the first, showing the nature of the claim made by appellee in his cross-petition: "The defendant further says that, in carrying on the business heretofore mentioned for the benefit of the said joint enterprise, he sold to the Western Stock Yards Company, on about May 23, 1907, 62 yearling steers, previously purchased by him from other parties, for the sum of $1,053.31; that the selling price of said steers was represented by a check given to the said William Harrell for the said sum of money by the Western Stock Yards Company on the First National Bank of Amarillo, and this defendant immediately delivered said check to the said plaintiff, the Amarillo National Bank, and that the said check was collected and the Western Stock Yards Company and the bank upon which it was drawn paid the full amount of said check, but the defendant says that he did not receive credit therefor in his said account carried with this plaintiff, and the proceeds of the same and the amount represented by said check were wholly lost to him to his damage, and the damage of said partnership and joint enterprise in the amount of $1,055.31, with 6 per cent. interest thereon from the date of said check, for which amount defendant here now sues, and this defendant says he did not authorize the said plaintiff to collect the said check, or to receive the same without giving his account proper credit therefor, and that no authority to collect or otherwise apply the proceeds of such check was given to any agent or representative of such bank, or to any other person, but that said check was received and collected under agreement that the same should be applied to the account of defendant, and that his account should receive credit therefor on the books of plaintiff."

The other counts in the cross-petition set up the following items: Second. Cash-

ier's check for $954.78, deposited June 25, 1907, for sale of the partnership cattle, for which he alleges no credit was given his account. Third. Cashier's check, dated November 5, 1907, for $1,155.72, sale of cattle for which he did not get credit. Fourth. Cashier's check, June 6, 1907, for $160. Fifth. $100, June 15, 1907, for two bulls. Sixth. Check from Rock Island & Gulf Railway Co. for $70, December 1, 1907, for damages to cattle. Seventh. Voucher for damages in the sum of $1,850, December 5, 1908. Eighth. The sum of $500, which is alleged was not credited to appellee's account. This arose out of a sale of cattle to Wilson-Popham Cattle Company for $3,000, March 29, 1909. He alleges he directed that $2,500 of that sum be paid on his note, and that only $2,000 was credited on his note, and only $500 placed to his credit in the bank, and that appellant has not accounted for the remaining $500. Ninth. It is alleged that on or about the 27th day of January, 1908, appellant took from appellee's account $1,600 on a check payable to R. L. Stringfellow, signed "Charge William Harrell," which he alleges was without his authority or consent. Tenth. And also on August 8, 1908, that a check for $66.50 was drawn in favor of E. S. Burgess, signed William Harrell, by R. L. Stringfellow. Eleventh. On November 9, 1908, a check for $214.30, payable on interest loan 505, Ft. Worth, was checked from the account. It is alleged that the partnership was dissolved by the death of R. L. Stringfellow, May 14, 1909; that he had been refused access to the books, and had been unable to get a statement of the account, though he had repeatedly requested such statement, and he did not therefore know the condition of his account. He further alleges that he had the exclusive control of the account in the bank in his name, and the sole authority of checking upon the same, and no other person or persons or representative of said bank was authorized to check upon said account, or use the money for any other purpose than those of giving credit in his behalf upon the books of the bank, and that the bank had full knowledge of the lack of authority of any other person to use said account or control the same in any manner. He further alleges that when the notes sued on were executed Stringfellow was sick, and he had been unable to get a statement of his account, and that pending the making of the statement, and at the instance of Stringfellow, the note should be executed, and that so soon as it could be done the bank would make a full statement of his account, and deduct therefrom the amount of the notes sued on, giving appellee credit for the amount then due him; that at such time and at all times since he was not indebted to the bank, but that it was largely indebted to him. He prays for judgment in his indi-

vidual capacity or in the alternative, as survivor of the partnership.

The appellant, by supplemental petition, replied by general denial, and specially setting out that the partnership accounts were first kept in the name of Stringfellow, and afterwards changed to the name of William Harrell, and that Stringfellow instructed the officers to pay no check on the account unless drawn by him or by William Harrell, and not to pay Harrell's checks unless he (Stringfellow) approved the same and directed the payment. The appellant brought in Mrs. Stringfellow, the executrix of the estate of R. L. Stringfellow, and prayed that if any judgment was found against it, it have judgment over against the estate of Stringfellow. Mrs. Stringfellow answered by exception and general denial and alleged Harrell was indebted to the estate, as would be shown by an accounting. The appellee excepted to the supplemental petition bringing in the executrix, and the court sustained both exceptions and dismissed Mrs. Stringfellow from the suit.

At the time the partnership was entered into between Stringfellow and Harrell, Stringfellow was president of the appellant bank, and was such up to the time of his death. Harrell testified the partnership agreement was that Stringfellow "was to furnish the money without interest to me, against my skill and labor. I was to have absolute control of buying, selling, and handling the cattle." The contract was entered into early in the year 1907. "The accounts for the business of Mr. Stringfellow and myself were to be kept in my name in the Amarillo National Bank, and nobody was to check on the account but myself." It appears that Harrell began buying cattle, and continued to do so for some months, only paying out money for expenses to secure the contracts. The delivery of these cattle was to be made later, and, to provide necessary fund, he executed to the bank a note for the sum of $11,285. This note Stringfellow admitted was his, and that he was liable thereon, and so informed the directors, and which we take from the evidence was an undisputed fact. And money obtained from the bank thereon was deposited therein in the name of R. L. Stringfellow. The amount was so carried in the name of R. L. Stringfellow until August 9, 1907, when it was changed to the name of William Harrell. There appears to be no controversy that the accounts, whether in the name of Stringfellow or Harrell, was known and understood by the employés and officials of the bank as partnership account of Stringfellow & Harrell, in the cattle business.

The following items for which appellee alleges he did not receive credit, were deposited in the bank, and Stringfellow's account given credit therefor, and which was then known by all parties, unless it was

Harrell, as the partnership account: An item for $1,055.35, May 24, 1907; $954.78, dated June 27, 1907; $160, June 16, 1907; check from C. L. Berry $100, May 21, 1907. These items were so deposited before the William Harrell account was opened. The item for $70 shows to have gone into the account of R. L. Stringfellow, October 5, 1907, and after the Harrell account was opened. The item for $1,850, paid by the Santa Fé Railroad Company on account of damages to cattle, was turned over to Stringfellow by Harrell. This item was never deposited in appellant bank by either Harrell or Stringfellow, but appears to have been used by Stringfellow in obtaining a credit on a note of his due for the sum of $8,000, to the First National Bank of Amarillo. We are not able to find whether or not this note was given for money used in the partnership. The item for $1,600, January 27, 1908, appears to have been drawn out upon a check payable to R. L. Stringfellow for $1,600, signed "Charge Harrell account," $1,000 of which sum then appears to have been deposited in the name of R. L. Stringfellow, in his individual account, and, $600 to his wife, Mrs. Stringfellow. The $3,000 item, March 1909, $2,000 of that amount was credited on the $4,000 note sued on in this case; $500 was deposited in the name of Stringfellow, and $500 in the name of Harrell. Harrell admitted that he had credit for $1,155.72 October 8, 1907. Harrell testified that all these sums were turned over to R. L. Stringfellow as proceeds of the enterprise, and that he turned them over to Stringfellow in the bank and in his office therein. The evidence from the deposit slips shows that the certificates of deposit were given and entered on the books of the bank by other officers of the bank other than Stringfellow. The $66.50 item shows to have been paid out of the partnership account for a purpose for which the partnership was not liable, on a check signed "William Harrell, · by R. L. Stringfellow." The item for $214.13, November 9, 1908, was a payment of interest on a $5,000 note due in Ft. Worth, made by Stringfellow. The check for that sum was by Stringfellow on Harrell's account, which was then a partnership account. Harrell, under the partnership agreement, as testified to by himself, is not liable for the interest on the note.

Harrell testified: "The account of the business of Mr. Stringfellow and myself was to be kept in my name in the Amarillo National Bank, and nobody was to check on the account but myself. Aside from Mr. Stringfellow's agreement to furnish the money with which to purchase the cattle and conduct the business, I was to have absolute control of everything." He further testified that Stringfellow was president of the bank at the time, and that as to the checks in question, he did not authorize Stringfellow to draw them, and did not draw them himself, and that he never gave the bank permission to pay them, and also: "My recollection is that I notified every man in the bank with reference to checks being drawn against my account. I notified them not to pay checks except over my signature." And on cross-examination: "There was no agreement between us with reference to Mr. Stringfellow drawing on the account. I do not know what Mr. Stringfellow told the Amarillo National Bank and its officers and agents with reference to that." And again, "No, sir; I do not know anything about how the account was opened to take care of the draft, and I do not know what instructions were given by Mr. Stringfellow to the officers of the bank with reference to that matter." "As I have testified before, he was to furnish the money and I was to work and buy the cattle and handle them and sell them out, and I checked on the Amarillo National Bank as per Mr. Stringfellow's instructions. The drafts might have been drawn in the name of R. L. Stringfellow by me. As I remember, I signed my own name. I may have signed R. L. Stringfellow & Co. to some of them." He stated his reason for notifying the bank force not to pay any checks unless signed by him was that one of his boys had checked on his account. It appears at this time he was the owner of another account with the bank in the name of Nelson & Co. The testimony does not disclose which account it was the boy checked on. The evidence is undisputed that Stringfellow notified all of ·the officers and employés not to pay any check on either of the accounts, the one in the name of Stringfellow and the other in the name of William Harrell, without he first saw the checks and approved their payment. There is no evidence that the bank or its officers, except Stringfellow, knew of the agreement between Harrell and Stringfellow that no one but Harrell should check on the account of the partnership. The evidence is also uncontroverted that the officers in the bank knew that the account, whether in the name of Stringfellow or Harrell, was a partnership account. The case was tried before a jury. The trial court instructed the jury that appellant bank was entitled to a verdict on the note sued on in the sum of $3,438.68, unless defeated by appellee's cross-action. The jury returned a verdict for appellant for the sum of $569.43 upon which judgment was rendered, and from which the bank brings this appeal.

[1] Appellant's first assignment complains at the action of the court in refusing a peremptory charge to find for appellant the full amount sued for, and requested peremptory charges as to each item declared on by appellee in its cross-petition. It is urged by appellant as a proposition that the existence of the agreement between the partners, lim-

iting the right of one of the firm to draw checks on the firm account, would not render the bank liable unless the existence of such an agreement was made known to the bank, and, further, the president had no authority to bind the bank in transactions with a firm of which he is a member, in the absence of special authority granted him by the board of directors.

It is to be noted in this case that Stringfellow was president of the bank, and that while acting in that capacity he entered into a copartnership with Harrell. The facts show that the checks, drafts, and moneys received by Harrell were turned over to Stringfellow, his partner, for the purpose of deposit. It is insisted that in receiving this money Stringfellow was the agent of the bank, and knowledge on his part of the agreement was knowledge to the bank. Ordinarily, this is the rule, but·"this principle only applies where the agent acquires his knowledge in the transaction of his principal's business, and we, therefore, think the doctrine of implied notice should be limited to cases of that character." Irvin v. Grady, 85 Tex. 120, 19 S. W. 1028; Teagarden v. Godley Lumber Co., 154 S. W. 973; Kauffman v. Robey, 60 Tex. 308, 48 Am. Rep. 264. In this case Stringfellow acquired the knowledge of the manner in which the account should be kept when he entered into an agreement with Harrell forming the partnership. This knowledge was not obtained in the business of the bank, but in his private, independent enterprise. This knowledge he did not impart to the directors,' or to any other officer of the bank. On the contrary, the evidence shows that Harrell had overdrawn Stringfellow's account in the partnership enterprise, and when Stringfellow was informed this overdraft must be covered, Harrell executed a note, and the money was then advanced by the bank and placed to the credit of Stringfellow in the bank. Harrell does not remember how he drew his checks, but thinks some of them were drawn "Stringfellow & Co." Stringfellow instructed the employés and officers of the bank that no checks should be paid out of the partnership funds without his approval. The knowledge as to how the partnership account should be kept was not learned by Stringfellow while within the apparent scope of his duties as president of the bank.

[2] In matters touching the agency, an agent cannot act so as to bind his principal when he has an adverse interest in himself. Story on Agency, 210. In making the deposit, Stringfellow 'represented both sides of the transaction, and in such matters the principal should not be charged with the terms of his partnership agreement with Harrell. In the case of La Brie v. Cartwright, 55 Tex. Civ. App. 144, 118 S. W. 785, it is said, "The doctrine that. a principal·is chargeable with notice known .to his agent

is based, not only upon the fiction of identity, but also upon the fact that it is the· duty of the agent to communicate his knowledge to his principal, and the presumption· that he has performed his duty. No such presumption can arise, however, where the· agent is dealing with the principal in his. own interest, or where for any other reason his interest is adverse to his principal, so that it is to his own interest not to communicate the knowledge to the principal. In such a case the general rule, that notice to an agent is notice to his principal does not apply." Bank v. American Dock & Trust Co., 143 N. Y. 559, 38 N. E. 713; Langlois v. Gragnon, 123 La. 453, 49 South. 18, 22 L. R. A. (N. S.) 414.

It would, we think, be carrying too far the rule that an agent's knowledge should be imputed to the principal where, as in this case, the money is shown to have been turned over to Stringfellow, the partner, by Harrell, and who in ordering its deposit did so to further his own ends and purposes. To impute to the bank his knowledge under such circumstances, when if he was violating his agreement, he was acting for himself or in the interest of the partnership, we think would trench upon the law of principal and agent. He was not in that transaction the agent of the bank. In the handling and the keeping of this money he was. the agent of the partnership.

[3, 4] The partner has the right, ordinarily, to direct how the accounts shall be kept in a bank, and when the bank has no notice to the contrary, it is its duty to enter it as directed. The cashier received this money from Stringfellow and entered it as directed by him. The deposit slips show that Stringfellow himself did not issue them or make the entry, but they were issued by the cashier or some assistant. The testimony of the appellee is that these checks were delivered to Stringfellow by appellee in person, and Stringfellow, after receiving them from Harrell, directed the entry to his credit, notifying the employés that it was partnership funds. These items of entry made before August 9, 1907, were entered in the name of Stringfellow, who was so holding the same for the partnership. Harrell admits he was issuing checks against this fund all during that time; not only the items set out in his petition were so deposited, but over $11,000 borrowed money from the bank was so deposited, as well as all others. He could assert with as much reason that he could sue for the $11,000 and all others as the particular items named. He checked against this account and used in the partnership enterprise all alike. It is an undisputed fact that on the 9th day of August, 1907, the partnership account was changed from the name of Stringfellow to Harrell. There is no evidence to show that these amounts were not carried forward to the Harrell account. In other words, there is no evidence that Har-·

rell or the partnership lost anything by the money being deposited in the name of Stringfellow instead of Harrell.

[5] The item of $1,850 paid by the Santa Fé voucher for damages Harrell testified he gave to Stringfellow. This voucher was never deposited in appellant bank, but Stringfellow owed a note to the First National Bank, to which he applied the voucher. Clearly appellant was not responsible for the acts of Stringfellow in so applying the money. The relation of debtor and creditor in no sense of the word was established between appellant bank and Harrell. The item for $1,155.72 Harrell admitted, while on the witness stand, that he had received credit on his account, and that he did not claim this amount, and asked that his claim therefor be disregarded. The $70 item, dated October 4, 1907, was delivered to Stringfellow by Harrell. Stringfellow directed that this item be placed to his credit. This was after the account was opened in the name of William Harrell. The deposit slip is marked "William Harrell."

[6] Stringfellow directed a check for $1,-600 made payable to himself, signed "Charge William Harrell," and then directed a deposit of $1,000 to himself and $600 to his wife. He also issued a $66.50 check, payable to one Burgess and signed the same "William Harrell, by R. L. Stringfellow." At Stringfellow's direction, a check was drawn on the partnership account for $214.-30, payable to interest account. This appears to have been drawn to pay interest on a $5,000 note due at Ft. Worth, which was for money Stringfellow had borrowed and used in the partnership business. Harrell says he nor the partnership were liable for the interest under the partnership agreement. In March, 1909, Harrell turned over to Stringfellow a $3,000 draft from the sale of cattle, and directed Stringfellow to credit the note sued upon with the sum of $2,500 out of said draft, and to place the other $500 to his credit. Instead of doing so, Stringfellow directed that $2,000 be credited on the note, and to credit Stringfellow's account with $500 and Harrell's account with $500. The facts, as before stated, are undisputed that the account of William Harrell was a partnership account, and with which Stringfellow was equally interested with Harrell. Harrell testified: "There was no agreement between us with reference to Mr. Stringfellow drawing on the account." He does state he notified all the bank force that no check was to be paid on his account without his signature. All the force denied this statement. The facts are uncontroverted that the account in the bank in the name of Nelson & Co. was in effect Harrell's individual account. The Harrell account being a partnership account, each partner would, without any agreement to the contrary, have a right to check thereon. Harrell says there was no agreement with reference to Stringfellow drawing on this account. We interpret this statement as meaning that there was no restriction on Stringfellow doing so. The bank officers knew Stringfellow himself had made the deposit. They knew it was a partnership account, and one in which they had specific instructions from Stringfellow that no check was to be paid without his approval. In so far as the bank was concerned, these were specific instructions, and which it must have held itself bound to observe. The payments made for which appellee sues were at the specific direction of Stringfellow, and upon his check, either signed "Harrell, by R. L. Stringfellow," or "Charge to account of Harrell." Bruni v. Garza, 26 S. W. 108.

One partner is the agent of the partnership, and may bind the partnership. Harrell now sues in the name of the partnership for partnership funds, which his partner drew out of the bank, and for aught that the bank knew, the same may have been due him on an accounting. It was held in Interstate National Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885, the mere payment of the money to or upon the checks of the depositor, does not constitute a participation in an actual or intended misapplication of the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust. Such circumstances do not impose upon the bank the duty, or give it the right, to institute an inquiry into the conduct of its customers, nor to protect those for whom it may hold funds. Coleman v. Bank, 94 Tex. 605, 63 S. W. 867, 86 Am. St. Rep. 871. It will be noted that appellee, as survivor, sues for money deposited in the bank by the partnership, and hence there was an implied contract to pay the partnership upon demand.

[7] It appears one partner may sue his copartner and another acting in collusion with such other, for the wrongful conversion of the partnership property. If the bank and Stringfellow were acting in collusion for the purpose of converting the property of the partnership, Harrell perhaps could sue for damages, but he could recover only his individual damages, unless he could show affirmatively a case entitling him to all the damages. Barker v. Abbott, 2 Tex. Civ. App. 147, 21 S. W. 72; Houghton v. Puryear, 10 Tex. Civ. App. 383, 30 S. W. 583; Reed v. Gould, 105 Mich. 368, 63 N. W. 415, 55 Am. St. Rep. 453. A partner we do not think can recover the entire value of the property regardless of his interest therein. He should allege and show his damage and interest.

[8] But it is doubtless the theory of appellee in this case that Harrell as survivor is entitled to sue and recover the entire value of the property. As survivor, he may do so, and it appears at common law the sur-

viving partner had the right to offset the partnership debt against an individual debt owing by him. Masterson v. Goodlett, 46 Tex. 407; Waln v. Hewes, 5 Serg. & R. (Pa.) 467; Miller v. Receiver, 1 Paige's Ch. (N. Y.) 444; Holbrook v. Lackey, 13 Metc. (Mass.) 132, 46 Am. Dec. 726; Bates on Partnership, vol. 2, § 723.

[9] The rule in this state is, whatever it may be in others, that the surviving partner is entitled to the assets as trustee, to pay debts of the partnership and to account to the personal representatives or heirs of the deceased partner, for their share in what is remaining. Altgelt v. Alamo National Bank, 98 Tex. 252, 83 S. W. 6; Rogers v. Flournoy, 21 Tex. Civ. App. 556, 54 S. W. 386; Akin v. Jefferson, 65 Tex. 137; Gresham v. Harcourt, 93 Tex. 149, 53 S. W. 1019.

[10] Appellee suing as survivor is entitled, if the partnership had a cause of action, to the whole sum of money sued for, and when he recovers he holds it as trustee, and he must account to the representatives of his deceased partner for their share. As illustrative, by the verdict of the jury in this case, they substantially find that Stringfellow used of the partnership funds the sum of $2,869.25, and therefore credit Harrell's note for that sum. Harrell, as trustee, must account to the Stringfellow estate for that sum. The bank is thereby forced to pay this sum twice to the same party—the partnership of Stringfellow and Harrell. Even if appellee instructed the bank that the money should be paid out only upon his check, yet if his partner checked the money out, that does not show a loss to the partnership, or to him. An accounting would give to him his share. The evidence in this case shows Stringfellow's estate to be solvent. It would be to our mind grossly inequitable to compel the bank to pay this money in this case. If it should try to recoup from the Stringfellow estate, it would be met doubtless with the plea that Stringfellow had not received more than his just share of the partnership. In other words, it would be to force the bank to demand an accounting of the partnership without any of the rights or privileges of a partner. The language quoted in the case of Reed v. Gould, 105 Mich. 368, 63 N. W. 415, 55 Am. St. Rep. 453, we think applicable: "We are not aware of any instance in which a person has been allowed, as plaintiff in a court of law, to rescind his own act, on the ground that such act was a fraud on some other person, whether the party seeking to do this has sued in his own name only, or jointly with some other person. * * * The defrauded partner may perhaps have a remedy in equity, by a suit in his own name, against his partner, and the person with whom the fraud was committed. Such a suit is free from the inconsistency of a party suing on the grounds of his own mis-conduct." Appellee in this case represents the partnership, and sues the bank for money that went into the partnership account and was drawn out by a member of the partnership, who placed it there. The cases in which a partner can sue his copartner and another are usually cases where the property of the partnership has been converted by some outside parties in collusion with the derelict partner; but here the partner himself deposited the money in the partnership account, and secured the fund of the partnership for his own or the partnership's interest, and the bank is sought to be made liable for that act of the partnership. We do not believe the appellee has established a cause of action against the bank, or the right to have his note set off by the item set up in his cross-petition. The note appears to have been executed by appellee for money used by him in purchasing a piece of real estate for himself. We think the trial court was in error in refusing to instruct a verdict for the appellant, as requested, for the amount sued for and against appellee on his cross-petition.

There are quite a number of assignments, which, under our view of the case, it is unnecessary to consider further.

The cause will be reversed and rendered for the Amarillo National Bank against the appellee, William Harrell, for the sum of $3,438.68, to bear interest thereon from the 6th day of September, 1912, and that appellee take nothing by his cross-petition.

HENDRICKS, J., not sitting.